**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CF ENTERTAINMENT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-2393 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

CF Entertainment and The Nielsen Company have a dispute about how much CF Entertainment must pay each month for Nielsen's ratings services for The Weather Channel. All parties agree that Nielsen's ratings services are a lifeline for the network. CF Entertainment needs the ratings services so that it can prove performance to its advertisers, and thus continue to collect advertising revenue. "And without advertising revenue, the forecast for The Weather Channel is not good." *See* Pl.'s Mem. in Supp. of Mtn. for Prelim. Injunction, at 1 (Dckt. No. 6).

The dispute stretches back a few years. Since 2018, CF Entertainment has paid Nielsen $475,000 per month for the services, over its objection. But CF Entertainment believes that the agreed-upon monthly fee is only $41,667, based on an agreement that the parties reached in 2017. After years of discord, CF Entertainment finally had enough and sued for breach of contract, claiming that it is entitled to pay the lower amount.

In the meantime, CF Entertainment announced to Nielsen that it will no longer pay the higher monthly rate, meaning the rate that it has paid since 2018. And it asks this Court to put its thumb on the scale. CF Entertainment filed a motion for a preliminary injunction, asking this Court to prevent Nielsen from suspending its services if CF Entertainment pays the lower

amount under the 2017 agreement.  In essence, CF Entertainment asks for an order that it can pay the lower amount, and in the meantime, Nielsen can't do anything about it.

The motion for a preliminary injunction is denied.  CF Entertainment has paid $475,000 (not $41,667) per month since 2018 under an amendment to the contract.  A preliminary injunction would change, not preserve, the status quo.

CF Entertainment argues that it would suffer an irreparable injury if Nielsen cuts off the ratings services.  But Nielsen has committed to continue to provide those services as long as CF Entertainment continues to pay the going rate.  If CF Entertainment pays, CF Entertainment will receive.  Continuing to pay full freight is not an irreparable injury.  If CF Entertainment is right about its contractual rights, then it can recover damages and make itself whole.  The three essential factors – the unlikelihood of success on the merits, the lack of an irreparable injury, and the existence of an adequate legal remedy – prevent this Court from turning back the clock to 2017.

## Background

CF Entertainment is an independent, closely held media company founded by comedian Byron Allen in the 1990s.  *See* Declaration of Mark DeVitre, at ¶ 4 (Dckt. No. 7).  It operates multiple cable networks and television stations.  *Id.*  The company is part of the Allen Media Group, a collection of integrated and centrally operated media and entertainment companies.  *Id.*  By and large, CF Entertainment operates networks with relatively small audiences – such as Justice Central, Comedy.TV, Cars.TV, and MyDestination.TV – on high triple-digit cable networks.  *See* Cplt., at ¶ 21 (Dckt. No. 1); Declaration of Peter Bradbury, at ¶ 9 (Dckt. No. 27-1).

Like most broadcasters, CF Entertainment relies primarily on advertising revenues to fund its operations. *See* Declaration of Mark DeVitre, at ¶ 5 (Dckt. No. 7). Advertisers pay CF Entertainment to air commercials during breaks in programming. *Id.* Before payment, advertisers need "proof of performance," that is, data showing the number of viewers watching the program when the advertisement airs. *Id.* Advertisers need to know that they're getting what they pay for.

Nielsen is a supplier of television audience measurement services. *See* Declaration of Peter Bradbury, at ¶¶ 4–7 (Dckt. No. 27-1). But Nielsen is not just "a" supplier. CF Entertainment paints Nielsen as an 800-pound gorilla in the industry. CF Entertainment depicts Nielsen as a hulking colossus, a "behemoth" that reigns supreme in the market for ratings services. *See* Cplt., at ¶ 14 (Dckt. No. 1). For good measure, CF Entertainment calls Nielsen a "heavy-handed" "bully[]" that puts other companies in a "stranglehold," "preys on smaller players," takes "hostage[s]," demands a "ransom," "extort[s]" payment, "bleeds these smaller companies dry," and uses its power to extract "predatory pricing." *Id.* at ¶¶ 1, 3, 4, 5, 15, 16, 48; Pl.'s Mem. in Supp. of Mtn. for Prelim. Injunction, at 2 (Dckt. No. 6).

Nielsen resists that characterization (*see* Declaration of Peter Bradbury, at ¶ 8), but suffice it to say that Nielsen is the dominant player in the market for ratings services. Most people have probably heard of Nielsen ratings, but few people can name a competitor.

Large, national advertisers require Nielsen ratings before they will pay for advertisements. *See* Declaration of Mark DeVitre, at ¶ 6 (Dckt. No. 7). Media companies, in turn, need contracts with Nielsen to prove performance. *Id.* Nielsen ratings are critical to advertising revenue. *Id.* Without Nielsen ratings, advertisers won't pay for commercials, and

advertising revenue would dry up. *Id.* The ratings are so essential that CF Entertainment labels Nielsen "monopolistic." *See* Cplt., at ¶ 1 (Dckt. No. 1).

In 2007, CF Entertainment entered into a contract with Nielsen titled the Nielsen Syndication Service Combined National-Local Service Agreement (the "2007 Agreement"). *See* Declaration of Mark DeVitre, at ¶ 7 (Dckt. No. 7). Nielsen agreed to provide ratings information and program measurement services to CF Entertainment under an established fee schedule. *Id.* The contract had a five-year term, with the option to extend. *See* Cplt., at ¶ 19. At the time, CF Entertainment primarily aired comedy and courtroom-centered programming on broadcast television. *See* Declaration of Mark DeVitre, at ¶ 8.

The 2007 Agreement recognized that CF Entertainment's portfolio could expand. *Id.* So the parties "agree[d] to promptly amend th[e] Agreement to include additional charges for such programming or other activities and to adjust the charges payable" if there was an "increase or change in the level or nature of the programming or other activities provided" by CF Entertainment. *Id.*; *see also* 2007 Agreement, at ¶ 2(b) (Dckt. No. 7, at 13 of 55). That "increase or change" could include an "acquisition." *See* 2007 Agreement, at ¶ 2(b).

In the decade that followed, CF Entertainment continued to grow. *See* Declaration of Mark DeVitre, at ¶ 9 (Dckt. No. 7). It expanded into cable television in 2009, creating and launching several networks. *Id.* The parties made adjustments through a series of amendments to the 2007 Agreement. *Id.* The amendments provided for gradual increases in the applicable monthly fees, raising them from $25,000 to $40,000 a month. *Id.*

The parties disagreed about how best to accommodate the need for a flexible fee structure in light of CF Entertainment's continuing growth. *Id.* at ¶¶ 10–11. CF Entertainment did not want to renegotiate the fee structure in piecemeal fashion each time that it acquired a new

network. *Id.* at ¶ 11. Instead, CF Entertainment wanted a new global fee structure that would encompass Nielsen's ratings services for any of CF Entertainment's existing networks, plus any networks that it might acquire in the future. *Id.* at ¶ 10. But Nielsen preferred to amend the agreement if there was an increase or change in CF Entertainment's business. *Id.* at ¶ 12. Nielsen preferred to take things one step at a time. *Id.*

In August 2017, the parties executed a global amendment to the 2007 Agreement (the "2017 Amendment"). *Id.* at ¶ 14; *see* 2017 Amendment (Dckt. No. 7, at 29 of 55). The 2017 Amendment established new fee schedules for the following seven years. *See* Declaration of Mark DeVitre, at ¶ 14 (Dckt. No. 7). The 2017 Amendment went into effect on October 1, 2017, and runs through September 30, 2024. *Id.* at ¶ 17.

Nielsen agreed to provide services including "audience measurement of Client's Networks (as set forth in the Allocation Grid)" and "confidential estimates of television tuning and viewing in the 50 United States." *See* 2017 Amendment, Schedule 1, at § A.1 (Dckt. No. 7, at 29 of 55); *see also* 2017 Amendment, at § 8 ("Schedule 1, attached hereto, is made part of the Agreement as of October 1, 2017 through September 30, 2024.") (Dckt. No. 7, at 31 of 55). CF Entertainment, in turn, agreed to pay Nielsen under a specific fee schedule. *See* 2017 Amendment, Schedule 1 (Dckt. No. 7, at 40–51 of 55).

Schedule 1 to the 2017 Amendment included an accompanying Allocation Grid, a multi-page spreadsheet that set the fee schedule. *See* 2017 Amendment, Schedule 1, Allocation Grid (Dckt. No. 7, at 40–51 of 55). The Allocation Grid identified the media services and digital services that Nielsen would provide, such as "Nielsen Measurement" services, "Nielsen Information" services, technology services, Digital Content Ratings, and so on. *Id.* The Allocation Grid also identified the monthly fees that CF Entertainment needed to pay, by year

and by channel. *Id.* So, for example, the monthly fees for measurement services for Justice Central and Comedy.TV totaled $127,646 (each) in the first year, and climbed to $171,057 by year seven. *Id.* (Dckt. No. 7, at 40 of 55).

The 2017 Amendment recognized that CF Entertainment's business could continue to expand. The parties agreed on a fee structure for "additional" Cable Networks:

> In the event Client requests measurement of one or more additional Cable Networks at any time during the term of this Schedule, each such Cable Network shall be added to this Schedule and receive the Services set forth in Sections A.1, A.3, A.4 and A.5 at a Fee of $41,667 per month for a maximum period of forty-eight (48) months, after which Client shall pay an amount for such Cable Network equal to the Fees set forth in the Allocation Grid for the second network, Comedy.TV.

*See* 2017 Amendment, Schedule 1, at § B.4 (Dckt. No. 7, at 36 of 55). The provision used the term "Cable Networks" in capital letters, suggesting that it was a defined term (or maybe a term of art). But no such definition appeared in the 2017 Amendment. *Id.*

A few months later, CF Entertainment made a major acquisition. On March 23, 2018, CF Entertainment acquired The Weather Channel from NBCUniversal Media, LLC ("NBC") and other owners. *See* Declaration of Mark DeVitre, at ¶ 18 (Dckt. No. 7). The viewership of The Weather Channel was larger – by several orders of magnitude – than the viewership of CF Entertainment's other channels. *See* Declaration of Peter Bradbury, at ¶ 19 (Dckt. No. 27-1).

CF Entertainment did not assume any contractual rights to ratings services for The Weather Channel as part of the acquisition. *See* Declaration of Mark DeVitre, at ¶ 19 (Dckt. No. 7). Before the sale, Nielsen had a contract with NBC to provide ratings services for its portfolio of cable networks. *Id.* But NBC terminated the ratings services for The Weather Channel when the deal closed. *Id.* So, after the sale, The Weather Channel had no contractual relationship with Nielsen. *Id.*

6

After closing, CF Entertainment reached out to Nielsen and requested ratings services for The Weather Channel. *Id.* at ¶ 20. CF Entertainment expressly invoked section B.4 of the 2017 Amendment, meaning the provision that established a fee schedule for "additional Cable Networks." *Id.* CF Entertainment expected ratings services at the rate of $41,667 per month for four years. *Id.*

Nielsen agreed to provide ratings services, but balked at the requested monthly fee. *Id.* at ¶ 21. Nielsen took the position that the fee schedule in section B.4 of the 2017 Amendment did not apply, apparently because The Weather Channel was not new to *Nielsen*. *Id.* The 2017 Amendment, Nielsen argued, only relates to "'networks that were not measured by Nielsen that may be added for incremental measurement (similar to Justice Central or Comedy.TV) during the term of the amendment.'" *See* Cplt., at ¶ 35 (quoting an email from a Nielsen Senior Vice President dated April 24, 2018). Nielsen responded that CF Entertainment needed to pay almost $500,000 per month, more than 10 times the amount stated in section B.4 (that is, $41,667).

Negotiations soured. CF Entertainment viewed Nielsen's demand as exorbitant and, worse yet, a "clear breach of contract." *See* Declaration of Mark DeVitre, at ¶ 22 (Dckt. No. 7). Nielsen dug in and refused to budge. Nielsen threatened to terminate its ratings services unless CF Entertainment paid its price. *Id.*

The loss of services was not a viable option for The Weather Channel. At least half of its annual revenues comes from advertising. *Id.* at ¶ 23. "[W]ithout Nielsen's ratings services, there would be no advertising revenues from The Weather Channel, and without advertising revenues, there would be no Weather Channel at all." *Id.* at ¶ 22. So, as CF Entertainment tells it, the company was "forced to comply" with Nielsen's demand. *Id.*; *see also id.* at ¶ 24 ("CF Entertainment had no choice but to sign it; we could not risk losing Nielsen's ratings services.").

The parties ultimately cemented yet another agreement. On November 16, 2018, CF Entertainment and Nielsen signed the so-called "2018 Amendment." *Id.* at ¶ 24; *see also* 2018 Amendment (Dckt. No. 7, at 53 of 55). The 2018 Amendment added The Weather Channel to their preexisting agreement. *See* 2018 Amendment, at ¶ 1 (Dckt. No. 7, at 53 of 55) ("The Weather Channel is added to the Agreement as of November 1, 2018.").

The parties agreed to a fee schedule for The Weather Channel for the following six months, meaning November 2018 to April 2019. After April 30, 2019, the fees were up in the air. Future fees were subject to negotiation:

> Client agrees to pay the Fees set forth in the Allocation Grid for the period November 1, 2018 through April 30, 2019 while the parties negotiate in good faith a Fee schedule for The Weather Channel (and matching Purchases) through September 30, 2024, unless terminated in accordance with Section 3.a. of the Agreement as amended August 2, 2017, which Fee schedule shall be effective as of May 1, 2019.

*See* 2018 Amendment, at ¶ 3 (Dckt. No. 7, at 54 of 55).

The fees during the six-month period were $475,000 per month. *See* Declaration of Mark DeVitre, at ¶ 24 (Dckt. No. 7); Declaration of Peter Bradbury, at ¶ 23 (Dckt. No. 27-1).[1] That interim rate was lower than the rate paid by NBC when it owned The Weather Channel. *See* Declaration of Peter Bradbury, at ¶ 28.

The parties gave themselves six months of breathing room to negotiate an agreed monthly fee. It was not enough time. The deadline of April 30, 2019 came and went, and the

---

[1] The provision refers to the fees "set forth in the Allocation Grid." *See* 2018 Amendment, at ¶ 3 (Dckt. No. 7, at 54 of 55). The 2018 Amendment did not have its own Allocation Grid (or if it did, it wasn't filed). Maybe the "Allocation Grid" referred to the 2017 Allocation Grid, but it is not obvious how that spreadsheet provided the basis for the $475,000 monthly fee (especially given that CF Entertainment did not own The Weather Channel at the time). Still, all parties agree that the fee under the 2018 Amendment was $475,000 per month, so the Court will take it as a given.

parties did not reach an agreement on future fees. *See* Declaration of Mark DeVitre, at ¶¶ 25–26 (Dckt. No. 7).

Nielsen continued to demand that CF Entertainment pay $475,000 per month for its ratings services for The Weather Channel. *Id.* at ¶ 26. Once again, CF Entertainment wanted a long-term solution. *Id.* at ¶ 27. Negotiations continued for months, without success. *Id.*

CF Entertainment upped the ante. In the fall of 2019, CF Entertainment informed Nielsen that it refused to pay the "exorbitant fees" of $475,000 per month. *Id.* at ¶ 28. Going forward, CF Entertainment would pay based on the fee schedule in the 2017 Amendment, unless the parties reached an agreement. *Id.*

Nielsen responded by cutting off all of its ratings services for The Weather Channel. *Id.* at ¶ 29. The suspension left CF Entertainment "paralyz[ed]." *Id.* Without the ratings services, The Weather Channel could not earn advertising revenue. *Id.*

It was a "dire turn of events," and "threatened the continued existence of The Weather Channel." *Id.* at ¶ 30. So CF Entertainment changed course. On October 1, 2019, the same day that Nielsen suspended its services, CF Entertainment wired the outstanding balance of almost $3.5 million. *Id.* CF Entertainment put its foot down, but when push came to shove, it backtracked.

Nielsen took the position that it would continue to provide ratings services on a month-to-month basis under the 2018 Amendment. That is, CF Entertainment needed to pay $475,000 each month for the services for The Weather Channel. *Id.* at ¶¶ 31–32.

Things came to a head in the spring of 2020. CF Entertainment accrued an outstanding balance of $2.375 million (under Nielsen's view of the contract, that is). *Id.* at ¶ 32. Once again, Nielsen threatened to terminate its ratings services if CF Entertainment did not pay its bills. *Id.*

Nielsen had pulled the plug once before, so CF Entertainment took the threat at face value. *Id.* CF Entertainment could not risk the suspension of the services. *Id.* It needed Nielsen's ratings services, but felt exploited by Nielsen's alleged failure to follow the 2017 Amendment.

On April 17, 2020, CF Entertainment filed a five-count complaint. In Count I, CF Entertainment seeks a declaratory judgment that the 2017 Amendment is a valid, enforceable contract, and that Nielsen has a continuing obligation to provide ratings services at a monthly rate of $41,667 for 48 months. Count II alleges that the 2018 Amendment is unconscionable, and thus void. In Count III, CF Entertainment alleges that Nielsen breached the 2017 Amendment by charging more than $41,667 per month. Count IV is a claim under the California Unfair Competition Law, and Count V is a claim for unjust enrichment.

That same day, CF Entertainment wired the full amount demanded by Nielsen, totaling $2.735 million. *See* Declaration of Mark DeVitre, at ¶ 32 (Dckt. No. 7). That payment, CF Entertainment believes, should be the last time that it pays the larger monthly fee. And it asks this Court to back it up.

CF Entertainment simultaneously filed a motion for a preliminary injunction. *See* Mtn. for Prelim. Injunction (Dckt. No. 5). CF Entertainment seeks an order "enjoining [Nielsen] from terminating or in any way altering the nature of any services it is currently providing to CF Entertainment, including . . . The Weather Channel, during the pendency" of this case. *Id.* at 1. Basically, CF Entertainment wants to pay only $41,667 per month while this lawsuit proceeds, and wants this Court to take away Nielsen's ability to pull the plug.

## Analysis

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). "An equitable, interlocutory form of relief, 'a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'" *See Valencia v. City of Springfield*, 883 F.3d 959, 965 (7th Cir. 2018) (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008)). "It is never awarded as a matter of right." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017).

District courts apply a two-step process when deciding whether to award injunctive relief. *See Valencia*, 883 F.3d at 965. There is a threshold phase, and a balancing phase. *Id.* The threshold phase requires the party seeking the injunction to show that "(1) absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims; (2) traditional legal remedies would be inadequate; and (3) its claim has some likelihood of succeeding on the merits." *Id.* (internal quotation marks omitted) (quoting *Girl Scouts*, 549 F.3d at 1086). The moving party must satisfy all three requirements, or else the court "must deny the injunction." *Girl Scouts*, 549 F.3d at 1086.

If the movant satisfies each requirement, the balancing stage comes next. District courts "weigh[] the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Valencia*, 883 F.3d at 966 (cleaned up). The balancing is a sliding scale. *Id.* "The more likely the plaintiff is to win, the less heavily need the balance

of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984).

The decision rests on the district court's discretion, based on a preliminary look at the merits and an assessment of the likely outcome with and without an injunction. "Taking into account all these considerations, the district court must exercise its discretion 'to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case.'" *Girl Scouts*, 549 F.3d at 1086 (quoting *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1436 (7th Cir. 1986)). "The sliding scale approach is not mathematical in nature, rather 'it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.'" *Stuller v. Steak N Shake Enters.*, 695 F.3d 676, 678 (7th Cir. 2012) (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895–96 (7th Cir. 2001)). "Stated another way, the district court sits as would a chancellor in equity and weighs all the factors, seeking at all times to minimize the costs of being mistaken." *Id.* (cleaned up).

A preliminary injunction "is an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved." *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir. 2001); *see also Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) ("[The] purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.") (cleaned up); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 783 (7th Cir. 2011) ("The preliminary injunction, after all, is often seen as a way to maintain the *status quo* until merits issues can be resolved at trial."); *Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co.*, 255 F.3d 460, 464 (7th Cir. 2001) ("A preliminary injunction is often said to be designed to maintain the status quo pending completion of the

12

litigation."). The status quo is the "last peaceable uncontested status" between the parties. *See* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948 (3d ed. 2020) (citation omitted).

A preliminary injunction that changes the status quo may not be categorically forbidden, *see Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 943–46 (7th Cir. 2006), but it does depart from a traditional justification for preliminary injunctive relief. "The settled rule of our tradition is that losses should remain where they fall until an adequate legal or equitable justification for shifting them has been demonstrated." *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1012 (10th Cir. 2004) (McConnell, J., concurring). "A judicial version of Hippocrates' ancient injunction to physicians – above all, to do no harm – counsels against forcing changes before there has been a determination of the parties' legal rights." *Id.*

"A preliminary injunction aims in part at achieving temporary peace between the parties. However, if it substantially shifts the lines of conflict, it is more likely to function as a weapon in the plaintiff's arsenal than as a cease-fire." *Id.* "Preserving the last peaceable uncontested status of the parties maintains a position to which both parties at least tacitly consented before their dispute, and its concomitant perverse incentives, arose." *Id.*

CF Entertainment has not carried its burden. All three factors – the unlikelihood of success, the lack of an irreparable harm, and existence of an adequate legal remedy – weigh against a preliminary injunction.

## I. Likelihood of Success on the Merits.

CF Entertainment has not demonstrated a likelihood of success on the merits. "The likelihood of success on the merits is an early measurement of the quality of the underlying

13

lawsuit." *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011). The required showing is not overly rigorous. In fact, the "threshold for demonstrating a likelihood of success on the merits is low." *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016). "[T]he plaintiff's chances of prevailing need only be better than negligible."[2] *Id.*

CF Entertainment has not climbed over the low bar. CF Entertainments rests its argument on a provision of the 2017 Amendment that governed the fees for "additional Cable Networks." On its face, the language is simple. "In the event Client requests measurement of one or more additional Cable Networks at any time during the term of this Schedule, each such Cable Network shall be added to this Schedule and receive the Services . . . at a Fee of $41,667 per month" for up to 48 months. *See* 2017 Amendment, Schedule 1, at § B.4 (Dckt. No. 7, at 36 of 55).

If the 2017 Amendment were the last word, CF Entertainment would have a likelihood – maybe a strong likelihood – of success on the merits. The provision establishes a flat fee of

---

[2] The Court applies the Seventh Circuit's "better than negligible" standard. Still, that standard seems in tension with the Supreme Court's repeated admonition that a "plaintiff seeking a preliminary injunction must establish that he is *likely* to succeed on the merits." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (emphasis added); *see also Glossip v. Gross*, 135 S. Ct. 2726, 2736 (2015) (same). In *Winter*, the Supreme Court reversed the Ninth Circuit for allowing a preliminary injunction based on a mere "possibility" of irreparable harm. *See Winter*, 555 U.S. at 21–23. The Supreme Court reiterated that a movant must show that irreparable harm is "likely," and concluded that the Ninth Circuit's "possibility" standard was "too lenient." *Id.* at 22. The same yardstick presumably would apply to the other factor, the likelihood of success. If anything, a "better than negligible" chance of success seems like a lower bar than a "possibility" of success. Both seem lower than the requisite showing that success is "likely." *Id.* at 20. In the related context of a stay of a preliminary injunction, the Supreme Court has made clear that "[i]t is not enough that the chance of success on the merits be 'better than negligible.'" *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (disapproving *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999)); *see also id.* (citing *Winter* and noting that there is "substantial overlap" between the standard for a stay and the standard for a preliminary injunction). The notion that a "better than negligible" chance of success suffices also seems at odds with the principle that a preliminary injunction is an "extraordinary" remedy. *Winter*, 555 U.S. at 24. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. Again, it makes no difference here because CF Entertainment did not show that it has a better than negligible chance of success.

$41,667 if CF Entertainment requests measurement services for "additional Cable Networks." *Id.* Months later, CF Entertainment requested such services for The Weather Channel, an "additional" network that was not covered by the 2017 Amendment (because CF Entertainment hadn't bought it yet).

The analysis is straightforward. The 2017 Amendment established a fee of $41,667 for any additional networks. The Weather Channel was an additional network. So the flat fee applied.

Nielsen argues that the provision does not apply because The Weather Channel was not new to *Nielsen.* As Nielsen sees it, the provision "did not establish pricing for CF Entertainment's future acquisition of an established network that Nielsen was already measuring." *See* Def.'s Resp. Brf., at 2 (Dckt. No. 27). Instead, it established a "bargain-basement price for small or newly launched channels that Nielsen had never previously measured." *Id.*; *see also id.* at 4 ("The contract included a flat rate for fledgling or long-tail networks not previously measured by Nielsen for the first few years after Mr. Allen launched them."); *id.* at 5 ("Section B.4 of the 2017 Amendment did not cover mature networks that CF Entertainment acquired that were already being measured by Nielsen.").

Support for that position is nowhere to be found in the text of the contract. The agreement covers "additional Cable Networks," not "additional Cable Networks never previously measured by Nielsen." The phrase "additional Cable Networks" does not mean "additional newly created Cable Networks" or "additional Cable Networks that are new to Nielsen." The agreement does not say that a channel qualifies if and only if it is a new channel that Nielsen has never measured. *See Sheehy v. Sheehy*, 299 Ill. App. 3d 996, 1001, 234 Ill. Dec. 34, 702 N.E.2d 200 (1998) ("A court will neither add language or matters to a contract about

15

which the instrument itself is silent, nor add words or terms to an agreement to change the plain meaning of the parties as expressed in the agreement.").

The cable network simply must be "additional." Additional to what? The surrounding text supplies the answer. *See Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 618 (7th Cir. 2019) ("[B]ecause words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others.") (quoting *Gallagher v. Lenart*, 226 Ill. 2d 208, 233, 314 Ill. Dec. 133, 874 N.E.2d 43 (2007)); Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) ("The text must be construed as a whole.").

Section B.2 established the fee schedule for Justice Central and Comedy.TV. *See* 2017 Amendment, Schedule 1, at § B.2 (Dckt. No. 7, at 35 of 55). Section B.3 set the fees for CF Entertainment's "Plex Networks." *Id.* at § B.3. So, when section B.4 referred to a request for "measurement of one or more additional Cable Networks," it meant networks that were in addition to the networks specified in the preceding sections of the agreement. There is not a hint in the agreement that an "additional" network meant a network that was new to the entire universe of channels rated by Nielsen.

Based on the context, the reference point for "additional Cable Networks" is other networks owned by CF Entertainment. The preceding sections confirm what the plain text of section B.4 says: the provision applies to cable networks that are in addition to the networks covered by the agreement.

Nielsen protests that it would make no commercial sense if "additional Cable Networks" included the addition of *any* cable network. *See* Def.'s Resp. Brf., at 5 (Dckt. No. 27). According to Nielsen, CF Entertainment's viewership is rock-bottom, which explains why

Nielsen offered bargain-basement pricing for "additional" channels. *Id.* at 4–5. But under CF Entertainment's reading, Nielsen argues, CF Entertainment could buy one of the most successful channels on cable television, and then take advantage of the opportunity for entry-level pricing. *Id.*

Nielsen may have a point that such an agreement might not be a good deal for Nielsen, from a commercial standpoint. But this Court will not rescue Nielsen from a contract that it made, and language that it accepted, because the deal is a bad deal. *See Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 258 (7th Cir. 1998) ("Learned Hand remarked that 'in commercial transactions it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves.'") (quoting *James Baird Co. v. Gimbel Bros., Inc.*, 64 F.2d 344, 346 (2d Cir. 1933)); *R.T. Hepworth Co. v. Dependable Ins. Co., Inc*., 997 F.2d 315, 320 (7th Cir. 1993) ("'[C]ourts do not sit to relieve contract parties of their improvident commitments, except within the limited dispensation conferred by the doctrine of impossibility, not here invoked.'") (quoting *Bidlack v. Wheelabrator Corp*., 993 F.2d 603, 609 (7th Cir.1993) (en banc)); *In re Flexible Automation Sys., Inc.,* 100 B.R. 986, 989 (N.D. Ill. 1989) ("This Court should not, and will not use the rules of contract interpretation to save a party from a bad deal or even a silly bargain—especially because it only appears to be a bad deal in retrospect given the subsequent events of filing for reorganization.").

Nielsen complains that such a reading is "not what the parties contemplated." *See* Def.'s Resp. Brf., at 5 (Dckt. No. 27). Maybe so. But what matters is the meaning of the words used in the contract. "Contract law does not depend on subjective intentions. It depends on objective manifestations of intent in words and actions." *Taylor v. JPMorgan Chase Bank, N.A.*, 958 F.3d 556, 573 (7th Cir. 2020).

The subjective intentions, hopes, and expectations of a party count for little when they run afoul of the express language of the agreement. *See Cox v. U.S. Fitness, LLC*, 2013 IL App (1st) 122442, ¶ 22, 377 Ill. Dec. 930, 2 N.E.3d 1211 (2013) ("Where a contract is interpreted as a matter of law, the contracting parties' 'subjective intentions are irrelevant; rather, the pertinent inquiry focuses upon the objective manifestations of the parties, including the language they used in the contract.'") (quoting *Carey v. Richards Building Supply Co.*, 367 Ill. App. 3d 724, 727, 305 Ill. Dec. 492, 856 N.E.2d 24 (2006)); *see also Lagen v. United Cont'l Holdings, Inc.*, 774 F.3d 1124, 1130 (7th Cir. 2014) ("Contract law depends not on private and unexpressed intentions but on objective expressions of intent and agreement."); *Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 259 (7th Cir. 1998) ("Evidence about the beliefs, wishes, hopes, and fears of [a party] would be inadmissible, for only objective evidence may be used to elaborate on a contract's meaning."); *Empro Mfg. Co., Inc. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir. 1989) ("Contract law gives effect to the parties' wishes, but they must express these openly. Put differently, 'intent' in contract law is objective rather than subjective."); *Robbins v. Lynch*, 836 F.2d 330, 332 (7th Cir. 1988) ("A signatory to a contract is bound by its ordinary meaning even if he gave it an idiosyncratic one; private intent counts only if it is conveyed to the other party and shared. . . . You can't escape contractual obligation by signing with your fingers crossed behind your back, even if that clearly shows your intent not to be bound."); *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814 (7th Cir. 1987) ("Yet 'intent' does not invite a tour through [a party's] cranium, with [that party] as the guide. . . . Secret hopes and wishes count for nothing.").

If the analysis stopped there, CF Entertainment would vault over the low threshold of a likelihood of success on the merits. But the words of the 2017 Amendment were not the final word. The parties amended their agreement in 2018, and the difference is everything.

The 2018 Amendment expressly embraced The Weather Channel as a network covered by their agreement. That amendment also established a framework for fees. The parties agreed upon a fixed fee for six months, meaning November 2018 to April 2019. At that point, the fee would be whatever they negotiated:

> Client agrees to pay the Fees set forth in the Allocation Grid for the period November 1, 2018 through April 30, 2019 while the parties negotiate in good faith a Fee schedule for The Weather Channel (and matching Purchases) through September 30, 2024, unless terminated in accordance with Section 3.a. of the Agreement as amended August 2, 2017, *which Fee schedule shall be effective as of May 1, 2019.*

*See* 2018 Amendment, at ¶ 3 (Dckt. No. 7, at 54 of 55) (emphasis added).

The last phrase – "which Fee schedule shall be effective as of May 1, 2019" – looms large in this dispute. The parties may not have pinned down a number. But they did bind themselves to a concept. The new fee would be whatever the parties "negotiate[d] in good faith." *Id.* As of May 1, 2019, the new fee "shall" be whatever they negotiated. *Id.*

The 2018 Amendment superseded the 2017 Amendment when it came to the fees for The Weather Channel after April 30, 2019. *See Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 469, 284 Ill. Dec. 58, 809 N.E.2d 180 (2004) ("A modified contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract."). The 2017 Amendment set a fixed monthly rate ($41,667), but the 2018 Amendment replaced that framework with an agreement to negotiate. The 2017 Amendment set the price in stone, but the 2018 Amendment set the price in motion.

CF Entertainment thinks that the lack of an agreement for a fixed fee means that the 2017 Amendment springs back to life. That is, CF Entertainment believes that there was an implied right of reversion (of sorts), or a snap-back provision. The parties needed to negotiate, but if they couldn't come to terms, the old would become new again, and the 2017 Amendment would govern once more.

The problem for CF Entertainment is that the 2018 Amendment says no such thing. There is no indication in the text that the 2017 Amendment was waiting in the wings, and would provide the default pricing structure if negotiations fell apart. In fact, the 2018 Amendment did the opposite. The new fee "shall" be whatever they negotiated. *See* 2018 Amendment, at ¶ 3 (Dckt. No. 7, at 54 of 55); *see also State Auto Prop. and Cas. Ins. Co. v. Brumit Servs., Inc.*, 877 F.3d 355, 358 (7th Cir. 2017) ("The use of the words 'shall' or 'must' is generally regarded as mandatory.") (citation omitted); *Maine Comm. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("The first sign that the statute imposed an obligation is its mandatory language: 'shall.'"). A provision that "the new fee shall be X" does not mean "the new fee shall be X, unless the parties cannot agree, in which case it will be Y."

Like Nielsen with the 2017 Amendment, CF Entertainment wants to add language to the 2018 Amendment. CF Entertainment reads the agreement to include a phantom provision, creating a default for the 2017 pricing structure if the parties cannot come to terms. But no such provision appears in the agreement.

Simply put, CF Entertainment may have had a right to a monthly fee of $41,667 under the 2017 Amendment. But CF Entertainment then agreed to change the terms of the deal in the 2018 Amendment. CF Entertainment agreed to enter uncharted territory, and pay whatever price

the parties could agree upon. CF Entertainment let go of its right to 2017 pricing in the 2018 Amendment, and having given it up, it is gone (unless the parties agree to bring it back).

CF Entertainment does have a claim that the 2018 Amendment is unconscionable. *See* Cplt. (Count II). Still, CF Entertainment does not rely on the unconscionability claim to show a likelihood of success on the merits, so the existence of that claim does not change the analysis. If anything, the fact that CF Entertainment advances an unconscionability claim underscores that the 2018 Amendment poses a bit of a roadblock. In any event, CF Entertainment is a large, highly sophisticated commercial entity, so an unconscionability claim faces a steep uphill battle. *See, e.g., Hyatt Franchising, LLC v. Shen Zhen New World I, LLC*, 876 F.3d 900, 902 (7th Cir. 2017) ("[I]n a commercial transaction between sophisticated parties the defense of unconscionability, *if available at all*, is an objective one that depends on the agreement's terms, not on what either side's lawyer may say about the negotiations.") (emphasis added).

At this point, the Court is not offering a definitive interpretation of the contract. A ruling on a motion for preliminary injunction is, by definition, preliminary and subject to change. *See, e.g., Planned Parenthood of Indiana and Kentucky, Inc. v. Adams*, 937 F.3d 973, 980 (7th Cir. 2019) (noting that motions for preliminary injunctions "call upon courts to make judgments despite uncertainties," so rulings are "subject to further consideration and revision after discovery, more evidence, and a trial"), *judgment vacated on other grounds sub nom. Box v. Planned Parenthood of Indiana & Kentucky*, 2020 WL 3578673 (Mem.) (2020); *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty-Abuse-Wisconsin, Inc.*, 991 F.2d 1249, 1258 (7th Cir. 1993) ("The court's previous holding, being a decision on a motion for a preliminary injunction, was itself only preliminary and subject to revision at any time."). "[T]he posture of the case at that time inevitably entails incomplete evidentiary materials and

hurried consideration of the issues," so the Court may revisit its preliminary conclusions at a later stage. *See Lac du Flambeau Band of Lake Superior Chippewa Indians*, 991 F.2d at 1258.

Maybe one of the parties can point to other language that sheds light on the meaning of the provisions in question. Or maybe a party could identify language that is ambiguous, and thus allow extrinsic evidence to come into play. *But see In re Airadigm Comms., Inc.*, 616 F.3d 642, 664 (7th Cir. 2010) ("'We will not bend the language of a contract to create an ambiguity . . . .'") (quoting *Chicago Bd. of Options Exch. v. Conn. Gen. Life Ins. Co.*, 713 F.2d 254, 258 (7th Cir. 1983)). At this early stage, the Court must deal with probabilities, and consider the likelihood of success. As things stand, on this record, CF Entertainment does not appear to have a contractual right to pay the monthly rate in the 2017 Amendment.

In sum, CF Entertainment has a negligible chance of prevailing on its claim that it has a contractual right to pay the fees under the 2017 Amendment (and nothing more).

## II.     Irreparable Harm

CF Entertainment also has not met its burden to show that it would suffer irreparable harm absent the injunction.

As the movant, CF Entertainment must demonstrate that it will "likely suffer irreparable harm" without a preliminary injunction. *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). Irreparable harm is "harm that cannot be prevented or fully rectified by the final judgment after trial." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984); *see also Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997) ("Irreparable harm is harm 'which cannot be repaired, retrieved, put down again, atoned for . . . . [T]he injury must be of a particular nature, so that compensation in money cannot atone for it.'") (citation omitted).

22

"The only harm that is relevant to the decision to grant a preliminary injunction is irreparable harm, since if it is reparable by an award of damages at the end of trial there is no need for preliminary relief." *In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003). A mere possibility of harm is not enough. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20–23 (2008); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011). "The moving party must demonstrate that he will likely suffer irreparable harm absent obtaining preliminary injunctive relief." *Whitaker*, 858 F.3d at 1044. But a certainty of harm is not required, either. *Id.*

The thrust of the argument is that The Weather Channel would evaporate if Nielsen does not continue to provide ratings services. The Weather Channel needs the ratings so that it can continue to collect advertising revenues. "[W]ithout Nielsen's ratings services, there would be no advertising revenues from The Weather Channel, and without advertising revenues, there would be no Weather Channel." *See* Pl.'s Mem. in Supp. of Mtn. for Prelim. Injunction, at 7 (Dckt. No. 6); *see also id.* at 13 ("The Weather Channel would be forced to shut down."). The loss of ratings services "would sound the death knell for The Weather Channel." *Id.* at 1.

But Nielsen is not threatening to cut the lifeline, *if* CF Entertainment continues to pay. Nielsen has promised to stay the course, if CF Entertainment will stay the course, too. The alleged harm would not come from the status quo.

After CF Entertainment filed suit, Nielsen sent a letter and confirmed that it would continue to provide ratings services if CF Entertainment continued to pay the going rate. "Nielsen made clear to you that we would continue providing services to The Weather Channel, provided that CF continued to pay the same interim rate contained in the 2018 Amendment while the parties' discussions continued." *See* Letter from Heather Gadkari dated May 12, 2020, at 1

23

(Dckt. No. 27-2, at 7). "So long as CF brings its account balance current and continues to pay the monthly fee set forth in the 2018 Amendment, Nielsen will continue to provide services to The Weather Channel." *Id.* at 1–2 (Dckt. No. 27-2, at 7–8).

So, CF Entertainment will get what it pays for. If CF Entertainment pays, CF Entertainment will receive. Continuing to pay at the going rate is not an irreparable injury.

Nielsen is not demanding that CF Entertainment pay a ransom out of the blue. It is not as if Nielsen is "demand[ing] that CF Entertainment pay $5 million, or even $10 million, per month for ratings services for The Weather Channel." *See* Pl.'s Reply Brf., at 4 (Dckt. No. 31). In fact, CF Entertainment acknowledges that it has paid the going rate for "roughly two years." *See* Pl.'s Mem. in Supp. of Mtn. for Prelim. Injunction, at 2 (Dckt. No. 6).

As a matter of equity, CF Entertainment can hardly complain about continuing to do what it has done for almost two years. The willingness of CF Entertainment to pay the disputed amount since November 2018 suggests that any harm is not irreparable. *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered."); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1017 (10th Cir. 2004) (McConnell, J., concurring) ("[W]hen a plaintiff is complaining of irreparable injury from a long-established state of affairs, a court may naturally ask why, if the injury is so pressing as to warrant preliminary relief, the plaintiff waited so long before bringing a claim.").

If anything, CF Entertainment would bring any such injury on itself. CF Entertainment defines the irreparable harm as the loss of services. But it will lose services only if it stops

24

paying for them. That is, CF Entertainment will suffer an irreparable harm only if it rocks the boat and stops paying what it has paid since November 2018.

A self-inflicted harm is a poor candidate for an irreparable injury. *See Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) ("[S]elf-inflicted wounds are not irreparable injury. Only the injury inflicted by one's adversary counts for this purpose."); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) ("That the government's asserted harm is largely self-inflicted 'severely undermines' its claim for equitable relief.") (citation omitted); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 2020) ("Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted.").

Equity is not likely to help those who bring harm on themselves. A self-created emergency is not cause for alarm, either. "One important question, when a plaintiff seeks emergency relief, is whether the plaintiff has brought the emergency on himself." *Morgan v. White*, 2020 WL 3818059, at *1 (7th Cir. July 8, 2020). True, it depends on the unique circumstances of each case. *Stuller, Inc. v. Steak N Shake Enter., Inc.*, 695 F.3d 676, 679 (7th Cir. 2012) ("[T]he question of whether an injury is readily avoidable and truly self-inflicted if not avoided – and thus not irreparable harm – depends on the particular circumstances of the case."). But here, CF Entertainment can avoid the injury simply by paying its bills.

In its reply brief, CF Entertainment argues that continuing to pay the going rate of $475,000 will inflict an irreparable injury. *See* Pl.'s Reply Brf., at 3–4, 8–9 (Dckt. No. 31). The difference between paying $41,667 and $475,000 per month will total over $5 million each year, and counting.[3] *Id.* at 8. If CF Entertainment has to pay $5 million in excess fees, the company

---

[3] The 2017 Amendment set a monthly fee of $41,667 "for a maximum period of forty-eight (48) months." *See* 2017 Amendment, Schedule 1, at § B.4 (Dckt. No. 7, at 36 of 55). Then, the going rate

"likely" will face layoffs. *See* Supplemental Declaration of Mark DeVitre, at ¶¶ 6–7 (Dckt. No. 32). The Weather Channel also would have to scale-back investments in new meteorological technologies. *Id.* at ¶¶ 8–11. The company would have a lower borrowing capacity, too. *Id.* at ¶¶ 12–14.

CF Entertainment made no such arguments in its opening brief, and thus they are waived. *See Carr v. Illinois State Police*, 758 F. App'x 556, 558 (7th Cir. 2019); *Nielen-Thomas v. Concorde Inv. Servs., LLC*, 914 F.3d 524, 534 n.11 (7th Cir. 2019); *U.S. v. Diaz*, 533 F.3d 574, 577 (7th Cir. 2008). But even if it had made the arguments from day one, they would not have carried the day. CF Entertainment's showing is too abstract and general. CF Entertainment does not explain why those harms exist now, but did not exist while it paid $475,000 each month since November 2018. Maybe the notion is that the excess fees have reached the tipping point, but if so, CF Entertainment does not develop the point. The showing of alleged harm is too insubstantial, non-specific, and speculative to justify injunctive relief.

In essence, CF Entertainment argues that it will have to make changes if it has less money rather than more. But that argument proves too much. Everyone would rather have more money rather than less, sooner rather than later. Every plaintiff who seeks damages would do *something* with the money if they had it from day one. On this set of facts, accruing additional damages is not an irreparable injury.

## III. Inadequate Legal Remedies.

Finally, CF Entertainment has not satisfied the third element. Damages could make CF Entertainment whole, so it has an adequate legal remedy.

---

would be the same fees that apply to Comedy.TV, which are higher than $41,667. *Id.* So, after four years, the monthly damages presumably would be smaller, because there would be a smaller delta between the rate contemplated by the 2017 Amendment and $475,000.

"The absence of an adequate remedy at law is a precondition to any form of equitable relief." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Damages are an inadequate remedy if they are "seriously deficient." *Id.* They do not need to be "wholly ineffectual." *Id.*; *Girl Scouts*, 549 F.3d at 1095. "Where the only remedy sought at trial is damages, the two requirements – irreparable harm, and no adequate remedy at law – merge. The question is then whether the plaintiff will be made whole if he prevails on the merits and is awarded damages." *Id.*

At bottom, the parties have a dispute about how much CF Entertainment needs to pay for Nielsen's services. CF Entertainment argues that it has a right to pay a monthly fee of $41,667, and Nielsen argues that CF Entertainment must pay $475,000. If CF Entertainment is correct, and prevails at trial, CF Entertainment can recover the delta as damages.

Sometimes damages are not an adequate remedy. *See Roland Mach. Co.*, 749 F.2d at 386. Damages would provide no comfort if the movant goes out of business, or if the non-movant becomes insolvent, in the meantime. *Id.* Damages may not suffice for injuries that are difficult to quantify, too. *Id.*

This case does not involve any such special circumstances. There is no suggestion that CF Entertainment would go out of business, or that Nielsen would become insolvent, if the parties maintain the status quo. The alleged losses are easy to quantify, too.

CF Entertainment's losses are "purely financial, easily measured, and readily compensated." *Praefke Auto Elec. & Battery Co., Inc. v. Tecumseh Prods. Co., Inc.*, 255 F.3d 460, 463 (7th Cir. 2001). Damages could make it whole, so there is no need for a preliminary injunction. *See D.U. v. Rhoades*, 825 F.3d 331, 339 (7th Cir. 2016) ("Because money damages could make D.U. whole again should she prevail in her lawsuit, she does not meet the standard

27

for irreparable harm."); *Girl Scouts*, 549 F.3d at 1095; 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 2020) ("[A] preliminary injunction usually will be denied if it appears that the applicant has an adequate alternate remedy in the form of money damages or other relief.").

## IV.    Balancing

CF Entertainment did not satisfy any of the elements, let alone all of them, so there is no need for this Court to reach the balancing stage. *See Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018). Still, for good measure, this Court concludes that the balance weighs against a preliminary injunction. "[T]he injunction must do more good than harm (which is to say that the 'balance of equities' favors the plaintiff)." *See Hoosier Energy Rural Elec. Co-op, Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009).

On this record, CF Entertainment has only a slight chance of success. Paying $475,000 instead of $41,667 each month is undoubtedly burdensome, but it is no greater than the burden that the company has carried since November 2018. Denying the preliminary injunction would keep the parties on the same track that they have followed for almost two years.

But granting the preliminary injunction would divert the parties from that well-worn path. An injunction would prevent Nielsen from taking action if CF Entertainment stops paying 90% of the going rate. Nielsen would lose almost $450,000 in revenue each month, even though it has the stronger hand on the merits. True, Nielsen could counterclaim and seek damages for the difference. But as the saying goes, possession is ninety percent of the law. This Court will not require Nielsen to forgo revenue now that it likely would recover later.

Nielsen also presented evidence that the monthly fee of $41,667 is not a commercially reasonable rate for a channel of the size and scope of The Weather Channel. *See* Declaration of

Peter Bradbury, at ¶ 28 (Dckt. No. 27-1). NBC apparently paid more than $475,000 per month for ratings services for The Weather Channel. *Id.* An injunction that prohibits the suspension of services would harm Nielsen by locking in a below-market rate. And it would create a temporary windfall for CF Entertainment even though it has the weaker hand on the merits.

CF Entertainment also appeals to the public interest, noting that the public and the government rely on The Weather Channel for information. Undoubtedly so. Still, there is no tangible reason to believe that The Weather Channel will shut down if the motion is denied. Nielsen will continue to provide ratings services if CF Entertainment continues to pay the current monthly rate. So the lifeline remains intact. Based on the Court's review of the record, there is no reason to believe that The Weather Channel will disappear into thin air.

### Conclusion

The motion for a preliminary injunction is denied.

Date: July 10, 2020

_____

Steven C. Seeger
United States District Judge

29