**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CF ENTERTAINMENT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-2393 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case involves a dispute between CF Entertainment and The Nielsen Company about the monthly rate for rating services for a newly acquired cable television channel. After buying The Weather Channel, CF Entertainment requested rating services from Nielsen, so that advertisers could know how many viewers were watching the weather.

They didn't have to start from scratch. CF Entertainment and Nielsen already had a contract in place for other channels, and that contract expressly contemplated the addition of other channels. So CF Entertainment wanted to pay the rate for The Weather Channel that it paid under the then-governing 2017 contract, meaning $41,667 per month. In fact, CF Entertainment believed that the agreement entitled the company to pay that monthly rate, and nothing else.

Nielsen had other ideas. Nielsen disputed that the monthly rate in the 2017 agreement applied to The Weather Channel. As Nielsen saw it, The Weather Channel was new to CF Entertainment, but it wasn't a new *channel*. And Nielsen had provided rating services for its prior owner. So, Nielsen sought a fee more than ten times higher ($475,000 per month).

The parties hatched a temporary solution in November 2018. The parties agreed that CF Entertainment would pay $475,000 per month for rating services through April 2019. The parties agreed to negotiate a long-term fee schedule in the meantime. But when May 2019 rolled around, the parties had not agreed on a new fee schedule.

At that point, the monthly rate was in limbo, and the parties were at loggerheads. CF Entertainment believed that the monthly rate should revert back to the rate in the parties' earlier contract, meaning the 2017 agreement. And Nielsen, for its part, continued to charge $475,000 per month.

CF Entertainment sued, raising a host of claims centered on the disputed monthly fee for rating services for The Weather Channel. Nielsen, in turn, moved to dismiss for failure to state a claim. For the following reasons, the Court grants in part and denies in part Nielsen's motion to dismiss.

## Background

The Court assumes familiarity with the relevant facts included in its opinion denying CF Entertainment's motion for a preliminary injunction. *See CF Ent., Inc. v. Nielsen Co. (US)*, 2020 WL 3892988, at *1–6 (N.D. Ill. 2020) (Dckt. No. 46). A short summary will do here.

That said, the Court recognizes that at the motion-to-dismiss stage, it must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). That standard doesn't apply when ruling on a motion for a preliminary injunction, which requires an assessment of the case's merits. *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011). There, the parties may present evidence. *See D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016). Both parties did so here when briefing the motion

for a preliminary injunction. *See, e.g.*, Declaration of Mark DeVitre (Dckt. No. 7); Declaration of Peter Bradbury (Dckt. No. 27-1).

When reviewing a motion to dismiss, the Court must generally "consider only the plaintiff's complaint." *Rosenblaum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002). Therefore, the declarations and other evidence submitted during briefing on the motion for a preliminary injunction will not come into play at this point. They are out of the picture.

In addition to the complaint, the Court may consider the parties' contracts, because the contracts are "documents that are critical to the complaint and referred to in it." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *see also Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018).

So, the Court sticks to the well-pleaded allegations in the complaint, which it assumes to be true, while also considering the parties' contracts.

CF Entertainment is a closely held media company founded by comedian Bryon Allen. *See* Cplt., at ¶ 11 (Dckt. No. 1). "The company is part of the Allen Media Group, a collection of integrated and centrally operated media and entertainment companies founded by Byron Allen in the early 1990s. Mr. Allen is a well-known entrepreneur, comedian and producer in the media industry." *Id.* CF Entertainment operates cable stations that typically have small audiences. *Id.* at ¶¶ 16, 21.

CF Entertainment makes money by selling airtime to advertisers who then air advertisements during breaks in programming (*i.e.*, commercials). *Id.* at ¶ 12. But to successfully sell airtime, it needs to provide advertisers with data showing how many viewers watch each program. *Id.* at ¶¶ 12–13. The number of viewers is a factor in determining the

airtime's value to advertisers. The more sets of eyes, the greater the potential impact for the advertising – and the greater the value to the advertisers.

That's where Nielsen comes in. It's a supplier – really, *the* supplier – of television audience measurement services. *Id.* at ¶ 14. It creates the data that CF Entertainment needs to give advertisers to sell commercial slots.

In 2007, CF Entertainment entered into a contract with Nielsen titled the Nielsen Syndication Service Combined National-Local Service Agreement (the "2007 Agreement"). *Id.* at ¶ 18. Nielsen agreed to provide ratings information and program measurement services to CF Entertainment under an established fee schedule. *Id.* The contract had a five-year term, with the option to extend. *Id.* at ¶ 19.

At the time, CF Entertainment primarily aired comedy and courtroom-centered programming on broadcast television. *Id.* Recognizing that CF Entertainment could grow – meaning that it would need to purchase additional rating services from Nielsen – the 2007 Agreement bound the parties "to promptly amend th[e] Agreement to include additional charges for such programming or other activities." *Id.*

Over the next decade, CF Entertainment did grow. It created and launched new networks and expanded into cable television. *Id.* at ¶ 20. So, the parties amended the 2007 Agreement in piecemeal fashion to accommodate this growth, including by increasing the monthly fees from $25,000 to $40,000. *Id.*

In August 2017, the parties executed a global amendment to the 2007 Agreement (the "2017 Amendment"). *Id.* at ¶ 26; *see also* 2017 Amendment (Dckt. No. 7, at 29 of 55). The 2017 Amendment established new fee schedules for the following seven years (through September 2024). *See* Cplt., at ¶¶ 27–29 (Dckt. No. 1). It included a detailed fee schedule for

each of CF Entertainment's networks. *See* 2017 Amendment, Schedule 1, Allocation Grid
(Dckt. No. 7, at 40–51 of 55).

It also recognized that CF Entertainment's business could continue to expand. So, the
parties agreed on a fee structure for "additional Cable Networks":

> In the event Client requests measurement of one or more additional
> Cable Networks at any time during the term of this Schedule, each
> such Cable Network shall be added to this Schedule and receive
> the Services set forth in Sections A.1, A.3, A.4 and A.5 at a Fee of
> $41,667 per month for a maximum period of forty-eight (48)
> months, after which Client shall pay an amount for such Cable
> Network equal to the Fees set forth in the Allocation Grid for the
> second network, Comedy.TV.

*Id.* at § B.4 (Dckt. No. 7, at 36 of 55).

Notice the phrasing. The 2017 Amendment referred to "additional Cable Networks."
Not "new Cable Networks." Not "Cable Networks that have never been on the air before." Not
"additional Cable Networks that are new to Nielsen." Instead, it used the inclusive phrase
"additional Cable Networks." But the 2017 Amendment did not define "Cable Network." *Id.*

In March 2018, CF Entertainment acquired The Weather Channel, the network at the
heart of this dispute. *See* Cplt., at ¶ 30 (Dckt. No. 1). With The Weather Channel now part of its
portfolio, CF Entertainment requested rating services from Nielsen. *Id.* at ¶ 33. It sought to pay
the rate for "additional Cable Networks" specified in the 2017 Amendment – that is, $41,667 per
month. *Id.* at ¶ 34.

Nielsen balked. The Weather Channel was new to CF Entertainment, but it wasn't new
to Nielsen. Nielsen had provided rating services for The Weather Channel's prior owner,
NBCUniversal Media.

Nielsen took a hard line about the applicable monthly rate under the 2017 Amendment.
As Nielsen saw it, the phrase "additional Cable Networks" didn't exactly mean "additional Cable

Networks."  It meant something closer to "additional Cable Networks [that Nielsen has never provided rating services for]."

Nielsen basically told CF Entertainment that "the rate structure in the 2017 Amendment only relates to networks that were not measured by Nielsen that may be added for incremental measurement."  *Id.* at ¶ 35 (quotation marks omitted).  In Nielsen's view, because it had previously measured The Weather Channel's ratings, the fee schedule in the 2017 Amendment didn't apply.  *Id.*  It instead sought nearly $500,000 per month.  *Id.* at ¶ 37.

Over the next seven months, the parties failed to resolve the fee dispute.  But CF Entertainment needed rating services to operate The Weather Channel.  Without rating services, there would be "no advertising revenues from The Weather Channel, and without advertising revenues, there would be no Weather Channel."  *Id.* at ¶ 38.  And CF Entertainment lacked "any viable alternative for obtaining viewership performance data" other than Nielsen.  *Id.*

So, in November 2018, the parties inked a new agreement.  This "2018 Amendment" did two things.  First, it added The Weather Channel to the parties' existing agreement.  *See* 2018 Amendment, at ¶ 1 (Dckt. No. 7, at 53 of 55) ("The Weather Channel is added to the Agreement as of November 1, 2018.").  Second, the parties agreed that CF Entertainment would pay Nielsen $475,000 per month for rating services for The Weather Channel.  *See* Cplt., at ¶ 39 (Dckt. No. 1).

But that rate was temporary.  It applied only for the next six months, through April 2019. After that point, fees would be the subject of negotiation:

> Client agrees to pay the Fees set forth in the Allocation Grid for the period November 1, 2018 through April 30, 2019 while the parties negotiate in good faith a Fee schedule for The Weather Channel (and matching Purchases) through September 30, 2024, unless terminated in accordance with Section 3.a. of the

> Agreement as amended August 2, 2017, *which Fee schedule shall be effective as of May 1, 2019*.

*See* 2018 Amendment, at ¶ 3 (Dckt. No. 7, at 54 of 55) (emphasis added).

April 2019 came and went, without the parties reaching a longer-term agreement on fees for The Weather Channel. *See* Cplt., at ¶ 40 (Dckt. No. 1). Nielsen continued to demand that CF Entertainment pay $475,000 per month. *Id.* CF Entertainment continued to disagree, and ultimately ceased payments in fall 2019. *Id.* at ¶ 44. In response, Nielsen suspended all services for The Weather Channel until CF Entertainment paid its outstanding balance of $3.47 million (under Nielsen's view of the contract, that is). *Id.* at ¶ 45. CF Entertainment paid the bill. *Id.*

A similar situation happened in April 2020. CF Entertainment disputed the $475,000 monthly rate and didn't pay the full amount, and Nielsen threatened to cut off service. So CF Entertainment paid the outstanding balance (again, under Nielsen's view of the contract). *Id.* at ¶ 47.

On April 17, 2020, CF Entertainment filed a five-count complaint. Count I seeks a declaratory judgment that the 2017 Amendment is a valid, enforceable contract, and that Nielsen has a continuing obligation to provide rating services at a monthly rate of $41,667 for 48 months. Count II alleges that the 2018 Amendment is unconscionable, and thus void. In Count III, CF Entertainment alleges that Nielsen breached the 2017 Amendment by charging more than $41,667 per month. Count IV is a claim under the California Unfair Competition Law. Count V is a claim for unjust enrichment.

CF Entertainment also filed a motion for a preliminary injunction. *See* Mtn. for Prelim. Inj. (Dckt. No. 5). It sought an order "enjoining [Nielsen] from terminating or in any way altering the nature of any services it is currently providing to CF Entertainment, including . . . The Weather Channel, during the pendency" of this case. *Id.* at 1.

Meanwhile, on July 7, 2020, Nielsen moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Def.'s Mtn. to Dismiss (Dckt. No. 40).

The Court denied CF Entertainment's motion for a preliminary injunction. *See CF Ent.*, 2020 WL 3892988, at *16 (Dckt. No. 46). In doing so, the Court developed a preliminary view of the merits of CF Entertainment's breach-of-contract claim (but not its other claims). *See id.* at *11–12.

The Court determined that *if* CF Entertainment's claim was based solely on the 2017 Amendment, then it had a likelihood of success on the merits. *See id.* at *9–10. "But the words of the 2017 Amendment were not the final word. The parties amended their agreement in 2018, and the difference is everything." *Id.* at *10. When they agreed to the 2018 Amendment, "[t]he parties may not have pinned down a number. But they did bind themselves to a concept. The new fee would be whatever the parties 'negotiate[d] in good faith.'" *Id.* (alteration in original) (quoting 2018 Amendment, at ¶ 3 (Dckt. No. 7, at 54 of 55)).

Therefore, "[t]he 2018 Amendment superseded the 2017 Amendment when it came to the fees for The Weather Channel after April 30, 2019." *Id.* And the 2018 Amendment says nothing about the 2017 Amendment springing back to life if the parties couldn't reach a deal. *Id.* So, the Court found that CF Entertainment did not have a likelihood of success on the merits of its breach-of-contract claim (based on the 2018 Amendment, that is). *Id.* at *11–12.

Recognizing that this ruling was preliminary, the Court noted that "[m]aybe one of the parties can point to other language that sheds light on the meaning of the provisions in question. Or maybe a party could identify language that is ambiguous, and thus allow extrinsic evidence to come into play." *Id.* at *11.

8

**Legal Standard**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*, 46 F.4th 535, 543 (7th Cir. 2022). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When sitting in diversity, the Court "must exercise care and caution" in applying state law. *Smith v. RecordQuest, LLC*, 989 F.3d 513, 517 (7th Cir. 2021). The Court must determine how the state's highest court would rule, with the decisions of the state's intermediate appellate courts providing controlling guidance "unless there is a convincing reason to predict the state's highest court would disagree." *Id.* (quotation marks omitted).

**Analysis**

**I.      Breach of Contract**

CF Entertainment alleges that Nielsen breached the 2017 Amendment by charging $475,000 per month to provide rating services for The Weather Channel, instead of the $41,667 monthly rate in the 2017 Amendment (Count III). *See* Cplt., at ¶ 73 (Dckt. No. 1). It also seeks a declaratory judgment that the 2017 Amendment is a valid, enforceable contract (Count I). *Id.* at ¶ 55.

CF Entertainment claims that Nielsen breached the 2017 Amendment during two time periods. First, CF Entertainment claims that Nielsen breached the 2017 Amendment between April 1, 2018 and October 31, 2018. That's the period after CF Entertainment purchased The Weather Channel, but before the 2018 Amendment took effect in November 2018. Second, CF Entertainment claims that Nielsen breached the 2017 Amendment after April 30, 2019, when the 2018 Amendment's fee schedule expired. *See* Pl's. Resp. to Def.'s Mtn. to Dismiss, at 8 (Dckt. No. 49).

The Court agrees that CF Entertainment has stated a claim for breach of contract from April 1, 2018 to October 31, 2018, meaning the period before the 2018 Amendment went into effect. During that period, CF Entertainment seemingly had a right to the monthly rate in the 2017 Amendment. But CF Entertainment has not stated a claim for the period after April 30, 2019. During that period, the 2017 Amendment did not spring back to life. Therefore, Nielsen's motion to dismiss Count III is granted in part and denied in part, and its motion to dismiss Count I is granted.

After reading the submissions on the motion to dismiss, the Court lands in the same place where it landed at the preliminary-injunction stage. "CF Entertainment may have had a right to a monthly fee of $41,667 under the 2017 Amendment. But CF Entertainment then agreed to change the terms of the deal in the 2018 Amendment. CF Entertainment agreed to enter uncharted territory, and pay whatever price the parties could agree upon. CF Entertainment let go of its right to 2017 pricing in the 2018 Amendment, and having given it up, it is gone (unless the parties agree to bring it back)." *CF Ent.*, 2020 WL 3892988, at *11.

For starters, CF Entertainment has stated a claim for breach of contract from April 1, 2018 to October 31, 2018 – that is, the period before the 2018 Amendment took effect. Here,

10

"[t]he analysis is straightforward. The 2017 Amendment established a fee of $41,667 for any additional networks. The Weather Channel was an additional network. So the flat fee applied." *Id.* at *8.

Nielsen argues that "CF Entertainment's Complaint does not *actually allege* that it paid Nielsen $475,000 per month (or any other fee) for [The Weather Channel] before it signed the 2018 Amendment." *See* Def.'s Reply to Pl.'s Resp. to Def.'s Mtn. to Dismiss, at 7 (Dckt. No. 50) (emphasis in original). Not so. The complaint alleges that CF Entertainment seeks damages for "the difference between the $41,667 monthly rate that CF Entertainment agreed to pay in the 2017 Amendment and the illegitimate rates *that it was forced to pay beginning in April 2018* up through the date of this filing." *See* Cplt., at ¶ 73 (Dckt. No. 1) (emphasis added); *see also id.* at ¶ 5 ("CF Entertainment seeks . . . damages reflecting the difference between the amounts that CF Entertainment should have paid under the 2017 amendment *and the amounts CF Entertainment was forced to pay since April 2018 . . . .*") (emphasis added).

Whether CF Entertainment in fact paid Nielsen for rating services during this period – and if so, at what monthly rate – is a factual question for later. For now, it is enough that CF Entertainment has alleged that it paid higher rates than the rates specified in the 2017 Amendment – the parties' then-current contract. And, as the Court determined in resolving the motion for a preliminary injunction, CF Entertainment has plausibly alleged that the $41,667 monthly rate applied to The Weather Channel at that time.

The period after April 30, 2019, is a different matter. After giving the issue a second look, the Court sticks to its earlier conclusion. "The 2018 Amendment superseded the 2017 Amendment when it came to the fees for The Weather Channel after April 30, 2019." *CF Ent.*, 2020 WL 3892988, at *10 (Dckt. No. 46).

11

Last time, the Court reached that conclusion applying the low bar needed to show a likelihood of success on the merits: "[T]he plaintiff's chances of prevailing need only be better than negligible." *Id.* at *7 (quoting *D.U.*, 825 F.3d at 338).[1]  CF Entertainment has "a negligible change of prevailing on its claim that it has a contractual right to pay the fees under the 2017 Amendment." *Id.* at *10.

The procedural posture is different at the motion-to-dismiss stage.  But the end conclusion is not.  The complaint has not stated a plausible claim for relief.  The parties replaced the fee schedule from the 2017 Amendment when they agreed to the 2018 Amendment.  Once the 2017 Amendment was gone, it was gone for good, unless the parties agreed to bring it back.  And they haven't.

The 2018 Amendment addressed the monthly fee that would apply after April 30, 2019.  The 2018 Amendment says that the parties would "negotiate in good faith a Fee schedule for The Weather Channel," and that "Fee schedule shall be effective as of May 1, 2019." *See* 2018 Amendment, at ¶ 3 (Dckt. No. 7, at 54 of 55).  The fee would be whatever they agreed that it would be.  When it came to future fees, the 2018 Amendment looked forward – it did not look back.

---

[1]  The Seventh Circuit has since clarified that a party seeking a preliminary injunction must show more than a better than negligible chance of success on the merits.  In particular, "the applicant must make a strong showing that she is likely to succeed on the merits." *See Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020).  A "better than negligible chance" of success won't cut it. *Id.* (quotation marks omitted).  The Court flagged this issue when ruling on CF Entertainment's motion for a preliminary injunction. *See CF Ent.*, 2020 WL 3892988, at *7 n.2.  Regardless, the Seventh Circuit's clarification does not change the standard for this motion.  If anything, relying on the lower standard at the preliminary-injunction stage made that ruling closer to the plausibility standard used when ruling on a motion to dismiss.

CF Entertainment had a contractual right to pay certain fees for "additional Cable Networks" in the 2017 Amendment. And then, in the 2018 Amendment, when it came to The Weather Channel, CF Entertainment let it go. Like a helium balloon, it's gone.

CF Entertainment argues that the contract contains ambiguities that require a different conclusion. None of the arguments moves the needle.

First, CF Entertainment argues that the 2018 Amendment is ambiguous because it retained all the terms in the 2017 Amendment except the terms that it expressly overrode. *See* 2018 Amendment (Dckt. No. 7, at 55 of 55) ("Except as expressly set forth in this Amendment, all terms and conditions set forth in the [2017] Agreement remain in full force and effect."). CF Entertainment believes that this provision created ambiguity about whether the 2017 Amendment's fee schedule would apply to The Weather Channel when the 2018 Amendment expired.

The problem for CF Entertainment is that the 2018 Amendment *did* set a new fee schedule for The Weather Channel. It expressly overrode the 2017 Amendment when it came to monthly fees for The Weather Channel. By the look of things, that change was the whole point of the 2018 Amendment. *See Schwinder v. Austin Bank of Chicago*, 809 N.E.2d 180, 189 (Ill. App. Ct. 2004) ("A modified contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract.").

In the 2018 Amendment, the parties agreed that CF Entertainment would pay $475,000 per month through April 2019. *See* 2018 Amendment, at ¶ 3 (Dckt. No. 7, at 54 of 55). And the parties agreed to negotiate a new fee schedule that would apply going forward "which Fee schedule shall be effective as of May 1, 2019." *Id.* The decision to make the negotiated fee

schedule effective beginning May 2019 shows that "[t]he 2018 Amendment superseded the 2017 Amendment when it came to the fees for The Weather Channel after April 30, 2019." *CF Ent.*, 2020 WL 3892988, at *10.

In fact, the 2018 Amendment retained many of the 2017 Amendment's provisions on purpose. For example, the 2017 Amendment's fee schedule still applied to all networks other than The Weather Channel. *See* 2018 Amendment, at ¶ 3 (Dckt. No. 7, at 54 of 55). But the 2018 Amendment overrode the provision setting fees for The Weather Channel. Retaining portions of the 2017 Amendment did not make the 2018 Amendment ambiguous.

Overall, the 2018 Amendment changed the rules of the game. The parties agreed to depart from the fee schedule from the 2017 Amendment, and agreed to a monthly rate of $475,000 while they negotiated a new monthly rate. *Id.*

Nothing in the 2018 Amendment said that the monthly fee from the 2017 Amendment would spring back to life if the parties could not come to terms by April 30, 2019. The parties did not agree on a resurrection. The parties agreed on a clear, blue sea. If they could not come to terms, then the monthly rate was up in the air.

Next, CF Entertainment argues that the 2018 Amendment is ambiguous because it preserved CF Entertainment's right to terminate Nielsen's services – a right spelled out in the 2017 Amendment. CF Entertainment agreed to pay Nielsen $475,000 per month "unless terminated in accordance with Section 3.a. of the Agreement as amended August 2, 2017." *Id.* In CF Entertainment's view, this reference to the 2017 Amendment's *termination* provision kept its *fee* provision waiting in the wings.

But the termination provision included in the 2018 Amendment doesn't say a word about fees. Instead, the 2018 Amendment says that the parties will negotiate a new fee schedule for

14

The Weather Channel which "shall be effective as of May 1, 2019" and last through September 2024. *Id.*

On the other hand, the 2017 Amendment's termination provision automatically renewed CF Entertainment's license agreement with Nielsen for October 2020 through September 2024 "unless notice of non-renewal is received by Nielsen at least one hundred twenty (120) days prior to the end of the preceding term (i.e., on or before June 3, 2020)." *See* 2017 Amendment (Dckt. No. 7, at 29 of 55).

Fitting these provisions together, any negotiated fee schedule for The Weather Channel was to take effect on May 1, 2019. And under the 2017 Amendment's termination provision – which the 2018 Amendment incorporated – CF Entertainment could have notified Nielsen by June 3, 2020 that it did not intend to renew its license for The Weather Channel for October 2020 through September 2024. That is, the 2018 Amendment set *fees* for The Weather Channel, and the 2017 Amendment controlled the *terms* to which the newly negotiated fees would apply.

The 2018 Amendment made clear that Nielsen could terminate its license by June 3, 2020, even though the parties would negotiate fees to last through September 2024. The reference to the 2017 Amendment's termination provision doesn't make the 2018 Amendment ambiguous when it comes to fees.

Finally, CF Entertainment argues that the requirement that "the parties negotiate in good faith" shows that the 2017 Amendment's fee schedule was resurrected. *See* 2018 Amendment, at ¶ 3 (Dckt. No. 7, at 54 of 55). If it wasn't, then Nielsen would have no incentive to negotiate a new fee schedule in good faith – because Nielsen would know that it wouldn't be bound to CF Entertainment's interpretation of the contract. It would have the upper hand in negotiations

15

because it would know that the 2017 Amendment wouldn't control fees for The Weather Channel after the 2018 Amendment expired.

The "good faith" language in the 2018 Amendment does not help CF Entertainment's cause. The argument proves too much. Under CF Entertainment's logic, if the 2017 Amendment sprung back to life in May 2019 when negotiations broke down, then *CF Entertainment* would have had no incentive to negotiate in good faith. CF Entertainment would have known that, if negotiations stalled, its preferred interpretation of the contract would control beginning May 2019.

The broader point is that CF Entertainment's incentive argument doesn't help it in light of the text of the 2018 Amendment. *See Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 259 (7th Cir. 1998) ("Evidence about the beliefs, wishes, hopes, *and fears* of [a party] would be inadmissible, for only objective evidence may be used to elaborate on a contract's meaning.") (emphasis added). Both parties bound themselves to negotiate a new fee schedule for The Weather Channel. The parties could have adopted the 2017 Amendment's fee schedule, the 2018 Amendment's interim fix, or set some other amount. Under the 2018 Amendment, it was up to the parties to decide.

In sum, the Court grants in part and denies in part Nielsen's motion to dismiss Count III. The Court denies the motion for CF Entertainment's breach-of-contract claim for the period April 1, 2018 to October 31, 2018, meaning the period governed by the 2017 Amendment before the 2018 Amendment went into effect in November 2018. And the Court grants the motion for CF Entertainment's breach-of-contract claim for the period after April 30, 2019.

Because the Court grants the motion for the period after April 30, 2019, it grants Nielsen's motion to dismiss Count I. The 2017 Amendment is no longer a valid, enforceable contract for The Weather Channel fees.

## II. Unconscionability

Count II seeks a declaratory judgment that the 2018 Amendment is unconscionable and therefore void. CF Entertainment contends that the Amendment is both procedurally and substantively unconscionable under Illinois law. Because the complaint does not state a claim under either theory of unconscionability, the Court grants Nielsen's motion to dismiss Count II.

Out of the gate, the claim is a bit of a headscratcher. CF Entertainment is not exactly a vulnerable, uninformed, small-potatoes operation. It is a large entertainment company, with plenty of resources and know-how. A prominent media mogul is at the helm. If you had to make a list of likely candidates for making an unconscionability claim, large entertainment conglomerates probably wouldn't be high on the list. So right away, there is trouble brewing on the horizon.

CF Entertainment argues that the 2018 Amendment is unconscionable because "Nielsen took advantage of its monopolistic bargaining power to force [CF Entertainment] to enter into a commercially unreasonable agreement by threatening to exercise a termination right that Nielsen did not have." *See* Pl.'s Resp. to Def.'s Mtn. to Dismiss, at 14 (Dckt. No. 49).

Illinois courts recognize two forms of unconscionability: procedural and substantive. "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power. Substantive unconscionability refers to those terms which are inordinately one-sided in one party's favor." *Razor v. Hyundai Motor Am.*, 854

17

N.E.2d 607, 622 (Ill. 2006). A contract may be unconscionable "based on either procedural or substantive unconscionability, or a combination of both." *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 263 (Ill. 2006). Whether a contract is unconscionable is a question of law. *Razor*, 854 N.E.2d at 622.

CF Entertainment's procedural unconscionability arguments focus on its alleged lack of bargaining power when agreeing to the 2018 Amendment. It also alleges that Nielsen engaged in "bad faith" negotiation tactics. *See* Pl.'s Resp. to Def.'s Mtn. to Dismiss, at 14 (Dckt. No. 49).

CF Entertainment's allegations fail to state a claim for procedural unconscionability under Illinois law. For starters, a "lack of bargaining power" in this context requires more than one party having a superior bargaining position. *See Streams Sports Club, Ltd. v. Richmond*, 457 N.E.2d 1226, 1232 (Ill. 1983) (holding that a "mere disparity of bargaining power is not sufficient grounds to vitiate contractual obligations").

Instead, it requires "some impropriety during the process of forming the contract depriving a party of a meaningful choice." *Kinkel*, 857 N.E.2d at 264 (quotation marks omitted). A party might lack a meaningful choice if its counterparty has misrepresented a fact critical to the contract. *See ChampionsWorld LLC v. U.S. Soccer Fed'n, Inc.*, 726 F. Supp. 2d 961, 974 (N.D. Ill. 2010). In short, "some fraud or similar wrongdoing must be shown to invalidate . . . a provision as unconscionable" based on a lack of bargaining power. *Williams v. Jo-Carroll Energy, Inc.*, 890 N.E.2d 566, 571 (Ill. App. Ct. 2008).

CF Entertainment doesn't allege fraud, misrepresentation, or anything similar. Instead, it gives the conclusory allegation "that Nielsen took advantage of its monopolistic bargaining power" during negotiations over the 2018 Amendment. *See* Pl.'s Resp. to Def.'s Mtn. to Dismiss, at 14 (Dckt. No. 49). This allegation is nothing more than the assertion that Nielsen

was in a superior bargaining position – it does not allege fraud, misrepresentation, or a lack of understanding about the contract's terms.

Moreover, Illinois courts "are reluctant to rewrite the terms of a negotiated contract between businessmen" when considering the parties' relative bargaining positions. *Fusion Capital Fund II, LLC v. Millenium Holding Grp., Inc.*, 590 F. Supp. 2d 1055, 1063 (N.D. Ill. 2008) (quotation marks omitted). Here, both CF Entertainment and Nielsen are sophisticated entities who were represented by corporate counsel when negotiating the 2018 Amendment. *See* Cplt., at ¶¶ 33, 39 (Dckt. No. 1); 2018 Amendment (Dckt. No. 7, at 55 of 55) (showing that CF Entertainment's general counsel Mark DeVitre signed the 2018 Amendment). CF Entertainment believed that the 2018 Amendment was a good deal at the time. It hasn't alleged facts showing that it came to that conclusion because of Nielsen's wrongdoing.

CF Entertainment's allegation that Nielsen used "bad faith" negotiation tactics fares no better. A contract isn't unconscionable "because of hard bargaining positions or the pressure of financial circumstances." *Koveleskie v. SBC Capital Mkts., Inc.*, 167 F.3d 361, 367 (7th Cir. 1999) (quoting *Kewanee Prod. Credit Ass'n v. G. Larson & Sons Farms, Inc.*, 496 N.E.2d 531, 534 (Ill. App. Ct. 1986)). Again, "the conduct of the party obtaining the advantage must be shown to be tainted with some degree of fraud or wrongdoing in order to have an agreement invalidated." *Id.* (quotation marks omitted). Under Illinois law, "driving a hard bargain is not a wrongful act." *Id.* Because that's all that CF Entertainment alleges, it has not stated a claim for procedural unconscionability.

Next, CF Entertainment argues that the 2018 Amendment was substantively unconscionable because the bargain the parties struck was not commercially reasonable. *See* Pl.'s Resp. to Def.'s Mtn. to Dismiss, at 15 (Dckt. No. 49).

CF Entertainment is right that a contract is substantively unconscionable if its terms are commercially unreasonable or "inordinately one-sided." *Phoenix Ins. Co. v. Rosen*, 949 N.E.2d 639, 656 (Ill. 2011). But CF Entertainment doesn't get past stating the rule.

A term is commercially unreasonable if "no one in his right mind would have agreed to" it. *We Care Hair Dev., Inc. v. Engen*, 180 F.3d 838, 843 (7th Cir. 1999) (quotation marks omitted). Indications of substantive unconscionability are "contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity." *Kinkel*, 857 N.E.2d at 267 (quotation marks omitted).

The 2018 Amendment doesn't fit the bill. The parties agreed that instead of litigating whether rating services for The Weather Channel were covered by the 2017 Amendment, CF Entertainment would pay $475,000 per month while the parties negotiated a long-term solution. As we know, a long-term solution didn't happen. But that doesn't mean that CF Entertainment's decision to pay a higher fee for the rating services and negotiate "[i]n an effort to stave off litigation" – or at least so the parties thought – was an inordinately one-sided deal. *See* Pl's. Resp. to Def.'s Mtn. to Dismiss, at 8 (Dckt. No. 49).

CF Entertainment inked the 2018 Amendment hoping to avoid a costly and time-consuming contract dispute. Maybe it never should have let go of its rights under the 2017 Amendment. Maybe in hindsight it wishes it hadn't done so. But substantive unconscionability isn't designed to rescue a sophisticated party from itself, and from its bad deals. Accordingly, the Court grants Nielsen's motion to dismiss Count II.

### III. Unfair Competition Under California's Unfair Competition Law

Count IV alleges that Nielsen violated California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE §§ 17200 *et seq.*, when it charged CF Entertainment $475,000 per month to provide rating services for The Weather Channel. But the parties' express contract included a choice-of-law provision selecting Illinois law. Because that provision governs the UCL claim, CF Entertainment cannot state a claim based on California law. The Court therefore grants Nielsen's motion to dismiss Count IV.

CF Entertainment alleges that "Nielsen has engaged in unfair business practices by demanding that CF Entertainment refrain from exercising its contractual right to pay the agreed upon $41,667 monthly rate" and "by threatening to cut off The Weather Channel's measurement services unless CF Entertainment continued to pay its excessive fees." *See* Cplt., at ¶¶ 81–82 (Dckt. No. 1). It alleges that Nielsen therefore violated California's UCL.

Nielsen argues that any claim based on California law is barred by the contract's choice-of-law provision. The parties' 2007 Agreement specified that "[t]his Agreement shall be construed and interpreted, and the parties' respective rights and duties governed, by and in accordance with the internal laws of the State of Illinois." *See* 2007 Agreement, at § 9(i) (Dckt. No. 7, at 22 of 55). Neither the 2017 Amendment nor the 2018 Amendment overrode this choice-of-law provision. *See* 2017 Amendment (Dckt. No. 7, at 31 of 55) ("Except as expressly set forth in this Amendment, all terms and conditions set forth in the [2007] Agreement remain in full force and effect."); 2018 Amendment (Dckt. No. 7, at 55 of 55) (same).

When sitting in diversity, this Court applies Illinois choice-of-law rules. *See NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 300 (7th Cir. 2018). Illinois courts generally enforce choice-of-law provisions. *See id.* (citing *Philips Elecs., N.V. v. N.H. Ins. Co.*, 692

N.E.2d 1268, 1278 (Ill. App. Ct. 1998)).  Here, the question is not whether the contract's choice-of-law provision is generally enforceable, but whether it applies to CF Entertainment's UCL claim.

California's UCL prohibits "unfair competition," including "any unlawful, unfair or fraudulent business act or practice."  CAL. BUS. & PROF. CODE § 17200.  Though the UCL "is not an all-purpose substitute for a tort or contract action," it does "provide[] an equitable means through which . . . private individuals can bring suit to prevent unfair business practices and restore money or property to victims of these practices."  *Graham v. Bank of Am., N.A.*, 172 Cal. Rptr. 3d 218, 231 (Ct. App. 2014) (quotation marks omitted).  At bottom, the UCL is a tort-based statute.

Under Illinois law, "tort claims that are dependent upon the contract are subject to a contract's choice-of-law clause regardless of the breadth of the clause."  *NewSpin Sports*, 910 F.3d at 306.  So are statutory claims containing "allegations [that] are so related to the contract that their resolution is intimately connected with the terms of the contract."  *WTM, Inc. v. Henneck*, 125 F. Supp. 2d 864, 867 (N.D. Ill. 2000) (citing *Boatwright v. Delott*, 642 N.E.2d 875, 877 (Ill. App. Ct. 1994)).

"In determining whether a tort claim is contract-dependent, courts examine whether the action alleges a wrong based upon interpretation and construction of the contract, or whether the claim alleges elements constituting an independent tort."  *NewSpin Sports*, 910 F.3d at 306 (quotation marks omitted).  Courts consider "whether:  (1) the claim alleges a wrong based on the construction and interpretation of the contract; (2) the tort claim is closely related to the parties' contractual relationship; or (3) the tort claim could not exist without the contract."

22

*Facility Wizard Software, Inc. v. Se. Tech. Servs., LLC*, 647 F. Supp. 2d 938, 943 (N.D. Ill. 2009).

Here, "all of [CF Entertainment's] allegations involve the parties' relationship as governed by" the 2017 and 2018 Amendments. *NewSpin Sports*, 910 F.3d at 306. The allegations charge Nielsen with "demanding" that CF Entertainment pay a monthly rate for The Weather Channel that was higher than in the 2017 Amendment. *See* Cplt., at ¶ 81 (Dckt. No. 1). But this allegation is just another way of saying that Nielsen believed that the fee schedule in the 2017 Amendment didn't apply to The Weather Channel. CF Entertainment believed that it did. So, the parties amended their contract to set rates for the next six months "while [they] negotiate[d] in good faith a Fee schedule for the Weather Channel." *See* 2018 Amendment (Dckt. No. 7, at 54 of 55). That's a contract dispute by any other name.

In fact, CF Entertainment's UCL claim "could not exist without the contract." *Facility Wizard Software*, 647 F. Supp. 2d at 943. It is premised on the allegation that Nielsen's "extortionate monthly rates" superseded CF Entertainment's ability to "exercise[e] its *contractual right* to pay the agreed-upon $41,667 monthly rate." *See* Cplt., at ¶ 81 (Dckt. No. 1) (emphasis added). And where did the "agreed-upon" rate come from? As the complaint tells it, the parties' contract. So, Illinois law applies.

CF Entertainment resists this conclusion. It argues that the choice-of-law provision doesn't apply because "Illinois courts have held that choice-of-law provisions do not dictate which state's law governs unfair trade practices claims." *See* Pl's. Resp. to Def.'s Mtn. to Dismiss, at 15 (Dckt. No. 49) (citing *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 537 (7th Cir. 2011)).

CF Entertainment's argument misses the mark. For starters, *Morrison* addressed a claim about the reach of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), not California's UCL. *Morrison*, 649 F.3d at 537. That is, it considered when ICFA applies to nonresident plaintiffs. *Id.* The answer to that question isn't helpful here.

And, more importantly, the argument proves too much. All that the Seventh Circuit noted in *Morrison* was that a choice-of-law provision didn't control whether the plaintiff could bring a well-pleaded ICFA claim "because a claim under [ICFA] is independent of the contract." *Id.* But (at least for a UCL claim) that's exactly the question before the Court: did CF Entertainment plead facts independent of its contract with Nielsen? Because the UCL claim is not independent of the contract claim for the reasons stated above, the contract's choice-of-law provision controls under Illinois law.

Once Illinois law applies, CF Entertainment's UCL claim is a dead letter. ICFA is Illinois's equivalent unfair-competition statute. *See* 815 ILCS 505/1 *et seq.* But CF Entertainment does not allege that Nielsen violated ICFA, or any other Illinois statute. Nor does it bring any other tort claim under Illinois law. Accordingly, the Court grants Nielsen's motion to dismiss Count IV.

## IV. Unjust Enrichment

Count V alleges that Nielsen was unjustly enriched when CF Entertainment paid the higher rates in the 2018 Amendment instead of the rates in the 2017 Amendment. Because the parties had an express contract, the Court grants Nielsen's motion to dismiss Count V.

Under Illinois law, unjust enrichment is based on an implied or "quasi" contract. *People ex rel. Hartigan v. E & E Hauling, Inc.*, 607 N.E.2d 165, 177 (Ill. 1992). The theory permits courts to imply the existence of a contract when none exists to avoid unjust results. *Id.* Because

24

the theory assumes that a contract *doesn't exist*, "[w]hen two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract." *Util. Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688 (7th Cir. 2004). Put simply, "[w]here there is a specific contract that governs the relationship of the parties, the doctrine of unjust enrichment has no application." *Guinn v. Hoskins Chevrolet*, 836 N.E.2d 681, 604 (Ill. App. Ct. 2005) (alteration in original) (quotation marks omitted).

CF Entertainment's unjust-enrichment claim is a nonstarter. The claim falls squarely within its express contract with Nielsen. It just rehashes the breach-of-contract claim. CF Entertainment's allegation that Nielsen "unfairly benefitted from its extortionate conduct to extract exorbitant monthly payments" refers to the exact same conduct that supports its contractual allegations. *See* Cplt., at ¶ 89 (Dckt. No. 1).

Acknowledging that an unjust-enrichment claim is inconsistent with a breach-of-contract claim, CF Entertainment contends that it was entitled to plead unjust enrichment in the alternative. *See* Pl's. Resp. to Def.'s Mtn. to Dismiss, at 16 (Dckt. No. 49) (citing *Prudential Ins. Co. of Am. v. Clark Consulting, Inc.*, 548 F. Supp. 2d 619, 624 (N.D. Ill. 2008)). Fair enough. But CF Entertainment has pled itself out of the rule's protection.

Rule 8(d)(3) of the Federal Rules of Civil Procedure permits a party to plead inconsistent claims. But a party may "not plead unjust enrichment in the alternative" to breach of contract if "it incorporates the other paragraphs of the complaint alleging the existence of a contract" into its unjust-enrichment claim. *NewSpin Sports*, 910 F.3d at 307.

CF Entertainment did just that. The first paragraph of the unjust-enrichment count "repeats and realleges the allegations of the foregoing paragraphs as though fully set forth herein." *See* Cplt., at ¶ 88 (Dckt. No. 1). And those preceding paragraphs – consistent with CF

Entertainment's breach-of-contract claim – allege the existence of an express contract between the parties. *See, e.g.*, *id.* at ¶ 1 ("In 2017, CF Entertainment and Nielsen entered into a contractual amendment to their original 2007 agreement . . . ."); *id.* at ¶ 3 ("[F]ollowing CF Entertainment's acquisition of The Weather Channel in March 2018, CF Entertainment was forced to submit to Nielsen's demand that CF Entertainment sign an additional 'amendment' to the parties' existing agreement . . . ."); *id.* at ¶ 39 ("On November 16, 2018, under threat of service termination for The Weather Channel, CF Entertainment reluctantly signed an additional 'amendment' (the '2018 Amendment').").  CF Entertainment's pleading strategy "foreclose[d]" its "ability to pursue" an unjust-enrichment claim. *NewSpin Sports*, 910 F.3d at 307.

To make matters worse, the unjust-enrichment claim *itself* alleges the existence of an express contract.  CF Entertainment believes that Nielsen was unjustly enriched because it "benefitted from its extortionate conduct to extract exorbitant monthly payments from CF Entertainment, *notwithstanding the clear terms of the 2017 Amendment*." *See* Cplt., at ¶ 89 (Dckt. No. 1) (emphasis added).  That is, CF Entertainment's unjust-enrichment claim alleges that Nielsen breached an express contract.  CF Entertainment didn't adequately plead its unjust-enrichment claim in the alternative. *See Holman v. Indiana*, 211 F.3d 399, 407 (7th Cir. 2000) (holding that "[w]hile [plaintiffs] need not use particular words to plead in the alternative, they must use a formulation from which it can be reasonably inferred that this is what they were doing," such as "either-or" or "if-then" language).

The Court grants Nielsen's motion to dismiss Count V.

## Conclusion

For the foregoing reasons, Nielsen's motion to dismiss is granted in part and denied in part.

Date:  August 17, 2023

Steven C. Seeger
United States District Judge